ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

APR 2 3 2026

Kevin P Weimer, Clerk
By
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>EDWIN BRANT FROST IV | Criminal Information<br><br>No. 3:26-CR-00008 |

THE UNITED STATES ATTORNEY CHARGES THAT:

### COUNT ONE
*(Wire Fraud - 18 U.S.C. § 1343)*

1. Beginning on a date unknown, but from at least in or about 2021, and continuing through in or about July 2025, in the Northern District of Georgia, the Defendant, EDWIN BRANT FROST IV, did knowingly devise and intend to devise a scheme and artifice to defraud investors, and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, and for the purpose of executing the scheme and artifice to defraud, with the intent to defraud, caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds.

### Background

2. At all times relevant to this Information:

   a. FROST IV, a resident of Newnan, Georgia, owned First Liberty Building & Loan, LLC ("First Liberty").

b.  First Liberty was a Georgia corporation with its principal place of business in Newnan, Georgia. FROST IV served as the president of First Liberty from its inception in 2005 through July 2025.

### Scheme to Defraud

3.  Beginning in or about 2014, through First Liberty, FROST IV, began soliciting investors to raise capital through loan participation agreements and promissory notes. In soliciting investors, FROST IV:

a.  told investors that their funds would be used to make short-term small business loans at relatively high interest rates ("Bridge Loans");

b.  promised investors that they would receive rates of returns of between 8-18% interest on their investment (depending on the timing and type of investment), paid in monthly installments;

c.  promised investors that the Bridge Loans and interest would be repaid by borrowers through Small Business Administration ("SBA") or other commercial loans;

d.  told investors that First Liberty would be compensated from the origination fee and other related fees that borrowers would pay to obtain the Bridge Loans; and

e.  told investors that First Liberty would be compensated from the differential between the per annum interest rate paid by the borrower to First Liberty and the per annum interest rate that First Liberty paid to the investors.

4. On a date unknown, but at least by 2021, First Liberty stopped generating enough revenue (through the collection of fees and interest from borrowers) to pay the interest owed to investors. This deficit was caused by numerous defaults in the Bridge Loans that First Liberty funded and several borrowers had stopped making interest payments. Despite these defaults, however, FROST IV, through First Liberty, continued to make interest payments to investors on the defaulted loans as if the loans were current.

5. Due to the revenue deficit, on a date unknown, but at least by 2021, FROST IV caused First Liberty to use funds raised from new investors to make interest payments to existing investors. While doing so, FROST IV made material misrepresentations to investors. These misrepresentations included, among others, that:

  a. First Liberty would use a hundred percent of the investors' money to fund the Bridge Loans;

  b. investors would be repaid from the repayment of the Bridge Loans and associated interest;

  c. First Liberty had no more than a few Bridge Loans default; and

  d. the borrowers to whom First Liberty made Bridge Loans had already received approval for SBA loans and the Bridge Loan was only needed to provide funds while the SBA loan process was completed.

6. Contrary to these representations made by FROST IV, and as FROST IV well knew, returns to First Liberty investors were paid largely from newly invested funds coming from existing and new investors and not from borrowers' repayments of Bridge Loans; First Liberty's ability to continue paying monthly

interest payments was dependent on raising and using new investor money; most of the Bridge Loans funded by First Liberty were in default at the time of solicitation and investments by new investors; and that few, if any, Bridge Loan borrowers had received preapproval for an SBA loan at the time the Bridge Loan was funded.

7. FROST IV also omitted material facts in communicating with investors. FROST IV did not tell investors that several borrowers had defaulted on their loan obligations and, despite having defaulted, he was continuing to provide Bridge Loan financing to at least one of the defaulted companies; and he was using new investor funds to pay earlier investors, either for the payment of interest or for the return of principal.

8. In addition to using investor funds to make interest payments to other investors, FROST IV made payments to himself and his family members in excess of $5 million, including through the following expenditures:

    a. FROST IV spent over $230,000 in investor funds to rent a vacation home for his family in Maine;

    b. FROST IV spent over $140,000 in investor funds to purchase jewelry;

    c. FROST IV spent $20,800 in investor funds on a Patek Philippe watch;

    d. FROST IV spent over $2 million in investor funds on credit card bills; and

    e. FROST IV spent over $570,000 in investor funds on political contributions.

9. During the course of this scheme, FROST IV, through First Liberty, raised at least $140 million from at least 300 investors.

4

### Execution of the Scheme

10. On or about November 15, 2023, in the Northern District of Georgia, FROST IV, did, with the intent to defraud, for the purpose of executing the above-described scheme, caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds, that is, FROST IV caused victim J.P. to wire approximately $200,000 to a First Liberty bank account to invest in First Liberty's Bridge Loan program based on material misrepresentations and omissions.

All in violation of Title 18, United States Code, Section 1343.

### FORFEITURE

11.  Upon conviction of the sole offense alleged in this Criminal Information, the Defendant, EDWIN BRANT FROST IV, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly as a result of the offense, including, but not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the sole offense alleged in this Criminal Information.

12. If, as a result of any act or omission of the Defendant, any property subject to forfeiture:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.

THEODORE S. HERTZBERG
 *United States Attorney*


ANGELA ADAMS
 *Assistant United States Attorney*
Georgia Bar No. 613114


600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

6