**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWIN BRANT FROST, IV,<br><br>Defendant. | Case No. 3:26-cr-00008-LMM |

# SENTENCING MEMORANDUM OF EDWIN BRANT FROST IV

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018

and

LOTITO & KIRSCHENBAUM
1800 Peachtree St. NW, Suite 300
Atlanta, Georgia 30309

*Counsel for Defendant*
*Edwin Brant Frost, IV*

# TABLE OF CONTENTS

**Page**


SENTENCING MEMORANDUM ............................................................... 1

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ............................................................... 5

THE 3553 SENTENCING FACTORS COUNSEL A SIGNIFICANT VARIANCE FROM THE GUIDELINES LEVEL AND THE GOVERNMENT'S RECOMMENDATION ............................................................... 10

I. The History and Characteristics of the Defendant: Lifelong Acts of Service ............................................................... 10

II. The Guidelines' Offense Level Overstates Brant's Culpability .......... 22

III. Brant's Acceptance Of Responsibility Was Early and Extraordinary and Shows True Remorse and Post-Offense Rehabilitation ............................................................... 28

IV. The Prosecution and Its Collateral Consequences Have Already Imposed Significant Punishment ............................................................... 33

V. Deterrence ............................................................... 35

VI. The Need To Avoid Unwarranted Sentencing Disparities .................. 39

CONCLUSION ............................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007)....................45

*Peugh v. United States*,
569 U.S. 530 (2013)....................27

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ....................1, 26, 30, 37

*United States v. Anderson*,
267 F. App'x 847 (11th Cir. 2008)....................34

*United States v. Anderson*,
533 F.3d 623 (8th Cir. 2008) ....................34

*United States v. Blanco*,
102 F.4th 1153 (11th Cir. 2024)....................27

*United States v. Blarek*,
7 F.Supp.2d 192 (E.D.N.Y. 1998)....................47

*United States v. Carpenter*,
803 F.3d 1224 (11th Cir. 2015)....................23

*United States v. Clay*,
483 F.3d 739 (11th Cir. 2007)....................28

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) ....................24, 25

*United States v. Del Campo*,
695 F. App'x 453 (11th Cir. 2017)....................38

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004) ....................35

*United States v. Faulkenberry*,
759 F. Supp. 2d 915 (S.D. Ohio 2010),
*aff'd*, 461 F. App'x 496 (6th Cir. 2012) ....................................................25

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993),
*aff'd*, 31 F.3d 73 (2d Cir. 1994)............................................................36, 37

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................24

*United States v. Hendrick*,
No. 04-10009-CR-ZLOCH, 2009 WL 10709763
(S.D. Fla. Sept. 23, 2009) ...........................................................................37

*United States v. Howard*,
28 F.4th 180 (11th Cir. 2022) .....................................................................37

*United States v. Johnson*,
No. 16-cr-457-1 (NGG), 2018 WL 1997975
(E.D.N.Y. Apr. 27, 2018) .................................................................26, 38, 39

*United States v. Malik*,
424 F. App'x 122 (3d Cir. 2011) .................................................................34

*United States v. Malone*,
No. CR 08-00776 EMC, 2012 WL 762000
(N.D. Cal. Mar. 7, 2012)..............................................................................28

*United States v. McQueen*,
727 F.3d 1144 (11th Cir. 2013) ...................................................................39

*United States v. Mohamud*,
No. 10-cr-4246 JM, 2021 WL 4460705 (S.D. Cal. Sept. 29, 2021)...................21

*United States v. Mueffelman*,
400 F. Supp. 2d 368 (D. Mass. 2005),
*aff'd*, 470 F.3d 33 (1st Cir. 2006) ...............................................................26

*United States v. Olis,*
Criminal No. H-03-217-01, 2006 WL 2716048
(S.D. Tex. Sept. 22, 2006) ...........................................................................36

*United States v. Redemann*,
295 F. Supp. 2d 887 (E.D. Wis. 2003) ..........34

*United States v. Rodriguez*,
64 F.3d 638 (11th Cir. 1995) ..........27

*United States v. Samaras*,
390 F. Supp. 2d 805 (E.D. Wis. 2005) ..........34

*United States v. Shy*,
538 F.3d 933 (8th Cir. 2008) ..........32

*United States v. Sponaugle*,
Case No. 19-103-LPS, 2022 WL 4079197 (D. Del. Sept. 6, 2022) ..........34

*United States v. Stewart*,
590 F.3d 93 (2d Cir. 2009) ..........33, 34

*United States v. Vigil*,
476 F. Supp. 2d 1231 (D.N.M. 2007) ..........35

*United States v. Walker*,
252 F. Supp. 3d 1269 (D. Utah 2017),
*aff'd*, 918 F.3d 1134 (10th Cir. 2019) ..........30

## SENTENCING MEMORANDUM

NOW COMES DEFENDANT EDWIN BRANT FROST IV, pursuant to 18 U.S.C. § 3553, and files this Sentencing Memorandum in support of a sentence of five years' imprisonment, plus restitution (at a later date) and supervised release, a sentence sufficient, but not greater than necessary, to serve each of the statutory sentencing factors.

## PRELIMINARY STATEMENT

> *[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.*
>
> *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) (Rakoff, J.)

Edwin Brant Frost IV will appear before this Court for sentencing, a 69-year-old man, broken, chastened and humbled. He agonized for the people he hurt even before he wept his way through each and every Victim Impact Statement ("VIS"). He is tortured every day by the pain he caused, and he is profoundly remorseful for violating the law and abusing the trust that clients, colleagues and customers placed in him. He accepts full responsibility for his conduct. Brant knows he should have done things differently. He is wiser today than he was yesterday.

Brant respects the advisory Sentencing Guidelines stipulations and calculations in the Plea Agreement, as well as the factual statement to which he

agreed at the guilty plea hearing. Nothing set forth herein should be taken to the contrary. But a Guidelines sentence or the 14-year term proposed by the government would condemn Brant Frost to die in prison. Such a punishment is far greater than necessary to serve the purposes of Section 3553(a) for this first-time, non-violent offender, whose criminal conduct – while undoubtedly serious – stands in stark contrast to the upright and honorable way he has lived nearly all of his life.

Brant has a constitutional right to be sentenced based on truth and not based on arguments or inferences that create a one-dimensional, exaggerated or cartoonish version of who he is or what he did. Although various accounts of this case might have onlookers thinking that Edwin Brant Frost IV is a ruthless and conniving shark who preyed on his local community to line his own pockets, *nothing could be further from the truth*. He is neither the swindler nor the con artist some imagine.

The *true* record of Brant's life is set forth in over 80 letters—meaningful, personal letters—that were written to this Court by friends and members of his community. The letter-writers know about this case. They understand the gravity of the charge. They also know Brant Frost IV better than any witness or lawyer or judge or probation officer ever will. They are people who have known Brant in the private spaces where character is most clearly revealed. They are unanimous in describing Brant as a gentle, kind, and loving soul – a man who is a promoter of

others. He asks little of the world and he covets only family, faith and service. Brant has never been fueled by self-interest, arrogance or ego, and he is not a person who looks down on anybody. That's why he is respected—even today, and even by some of the people he hurt—for his modesty, his decency and his generosity of spirit.

A critically important point in the sentencing analysis is Brant's crime was not motivated by nastiness, spite, or ill will toward others. His First Liberty investment program was not a sham or a con; it ran legally and successfully for many years, and it helped scores of community businesspeople fulfill their dreams. When economic events turned against Brant, and he feared that he would miss interest payments to investors, he made terrible decisions in the hope that his business would recover without anyone getting hurt. His was a poor, but quintessentially human reaction to a desperate financial situation. Brant didn't "target" anyone - rich or poor, sophisticated or unsophisticated, friend or stranger. His decisions were criminal to be sure, but they were borne of the hope that his business could recover and rebound and he could make things right for First Liberty investors. His choices, however misguided, were not borne of malice. Brant's brother explains:

> "[Brant's] earnest optimism and hard work led to many successful business transactions and enabled him to recover from ones that went poorly. In this case, however, Brant's great strength became his great weakness and led to perilous choices. Those choices were not taken out

> of greed, but with an earnest belief that "he could make everyone whole" with his next success. Perhaps it was irrational optimism, but it was earnest optimism. It was not malevolence. (Exh. A at 40).

> Helen Sherman, a 20-year friend makes a similar point:

> "I will never believe that Brant Frost IV would ever intentionally harm another individual in any way. . . I believe he was a man trying to hold things together until better economic times for . . . his clients." (Exh. A at 110).

Indeed, Brant's misconduct was at such odds with who he really is and how he led the rest of his life that even *victims* believe he acted improperly, but not with a nefarious motive:

> Like other investors, we lost money when Brant IV's business collapsed. He called us personally to share the news and accepted full responsibility without making excuses, which we appreciated. . . [W]e understand the hardship this collapse has caused on both sides. Yet we do not believe Brant acted with malice or ill-intent. (Exh. A at 78).

> I have known Brant for 25 years. I have never known him to be an evil or scheming person. I believe he made some seriously bad decisions that led to an unreasonable situation… ([redacted] VIS).

And the irrefutable evidence that Brant never aimed to hurt or exploit anyone: his own beloved daughter lost her life savings as an investor in the First Liberty program.

* * * * * *

Brant Frost still has a great deal to offer society and he is prepared to spend the remainder of his days working to repay the losses he caused if his sentence will allow it. We respectfully submit that a profound downward variance to a term of

five years would allow Brant to return home while he is still physically and intellectually capable of working in aid of restitution, and would do justice here. This request is based, among other reasons set forth herein, principally on:

- Brant's lifelong acts of kindness and community service;
- the offense level's gross overstatement of the seriousness of the conduct; and
- Brant's early and extraordinary acceptance of responsibility and commitment to rehabilitation.

As demonstrated below, Brant has suffered significant and substantial punishment, and will continue to do so, even without a long term of imprisonment. A five year sentence, therefore, would not unduly depreciate the seriousness of the offense or promote disrespect for the law. On the contrary, it would impose a sufficient—indeed, a just—punishment.

## BACKGROUND

From in or about 1993 through in or about 2025, Brant Frost operated First Liberty Building & Loan, LLC ("First Liberty"), a broker of residential and commercial loans in Newnan, Georgia. First Liberty was a small company, with fewer than ten employees, that arranged for loans to customers primarily through the SBA loan program and mortgage brokerage services. Brant grew and ran First Liberty without incident for many, many years.

In 2014, First Liberty began soliciting investors to raise capital through loan participation agreements and promissory notes. Investor funds were used to make short-term small business loans – also known as Bridge Loans -- at relatively high interest rates. Investors received rates of return between 8-18% interest on their investment (depending on the timing and type of investment), and their returns were paid in monthly installments. Investors were told that the Bridge Loans and interest would be repaid by borrowers through Small Business Administration or other commercial loans. Brant estimates that First Liberty funded over $100 million in Bridge Loans since the program began in 2012.

In First Liberty's final years, COVID hit, the economy turned, and many development projects were delayed or abandoned. Many of First Liberty's Bridge Loan borrowers defaulted or no longer made timely payments on the Bridge Loans. Much of the crisis was Brant's own doing – his risk management skills were dismal. Some of it was external – one significant borrower died before his project became operational, and Brant believes that another misrepresented the volume of tenant occupancy in a vacant office building purchase-releasing project. Whatever the cause of the crisis, Brant accepts complete and total full responsibility.

When First Liberty stopped generating enough revenue to pay the interest that was owed to the investors, Brant panicked. Many of his investors were friends and family - people he knew and loved and desperately did not want to let down.

Even worse, he had never even met many of the investors and the thought of causing damage and distress to totally innocent strangers was something he felt he could not allow to happen. First Liberty had never missed an interest payment to anyone and he wanted to continue to honor his obligations. A series of very poor decisions on his part followed.

Brant made material misrepresentations to investors and omitted certain material facts in the hopes things would right themselves and nobody would miss a payment. These misrepresentations included, among others, that: First Liberty would use investors' money to fund the Bridge Loans; that investors' would be repaid from the repayment of the Bridge Loans and associated interest; that First Liberty had no more than a few Bridge Loans default; and that the borrowers to whom First Liberty made Bridge Loans had already received pre-approval for SBA loans and the Bridge Loan process was only needed to provide funds while the SBA loan process was completed.

Contrary to these representations, in the last years of First Liberty's operations, the returns to investors were paid largely from newly invested funds coming from existing and new investors and not from borrowers' repayments of Bridge Loans; First Liberty's ability to continue paying monthly interest payments was dependent on raising and using new investor money; most of the Bridge Loans funded by First Liberty were in default at the time of solicitation and investments

by new investors; and few, if any, Bridge Loan borrowers had received preapproval for an SBA loan at the time the Bridge Loan was funded.

Brant also failed to tell investors that several borrowers had defaulted on their loan obligations and, despite those defaults, he continued to provide Bridge Loan financing to at least one of the defaulted companies; and he was using new investor funds to pay earlier investors, either for the payment of interest or for the return of principal.

During this excruciating time, Brant hoped he might find a solution to his financial woes through a virtual health care company he founded called MyHealthAI. He truly believed, down to his core, that MyHealthAI would be a success and give him the financial wherewithal to steady First Liberty's ship. The business plan was developed in association with a successful entrepreneur who operated successful cancer clinics and gave Brant reason to believe the project could generate tens of millions of dollars. Brant poured an enormous amount of time, money and effort into the company, including using certain First Liberty investor funds because he truly believed it would be a prosperous venture. He was wrong. MyHealthAI's projections were never realized. Brant failed. The SEC was investigating First Liberty and there would be no fixing the damage.

On June 27, 2025, First Liberty voluntarily closed its doors after 32 years in business.

On or about July 10, 2025, the U.S. Securities and Exchange Commission charged Brant Frost IV with securities fraud. Thereafter, Brant never proclaimed his innocence and never sought to delay the inevitable. He consented to the proposed judgment ordering the SEC's requested emergency and permanent relief, including an asset freeze and the appointment of a receiver. He began handing over assets to the receiver.

Brant also engaged in discussions with the U.S. Attorney's Office about a criminal disposition - even though he hadn't yet been criminally charged – because he thought it would accelerate recovery for the victims. On May 12, 2026, Brant pleaded guilty to wire fraud pursuant to a plea agreement. The Plea Agreement – and the Pre-Sentence Report ("PSR") set forth the advisory Guidelines range as follows:

| **Explanation** | **Level** | **Source** |
|---|---|---|
| Base offense level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss between $65 mill and $150 mill | +24 | U.S.S.G. § 2B1.1(b)(1)(M) |
| Substantial financial hardship to 25 or more victims | +6 | U.S.S.G. § 2B1.1(b)(2)(C) |
| Investment Adviser | +4 | U.S.S.G. § 2B1.1(b)(20)(A)(iii) |

| | | |
|---|---|---|
| Acceptance of Responsibility | -3 | U.S.S.G § 3E1.1 |
| Adjusted Offense Level | 38 | |
| Criminal History Category | I | |
| Advisory Guidelines Range | 235-240 months (235-293 months before 240-month statutory maximum, § 5G1.1(c)(2)) | Plea Agreement/PSR |
| Government Recommendation | 168 months | Plea Agreement, ¶ 20 |

## THE 3553 SENTENCING FACTORS COUNSEL A SIGNIFICANT VARIANCE FROM THE GUIDELINES LEVEL AND THE GOVERNMENT'S RECOMMENDATION

### I. The History and Characteristics of the Defendant: Lifelong Acts of Service

Criminal cases like this are often marked by the reflexive application of common tropes to define the defendant. *The greedy and conniving fraudster who wouldn't let rules or regulations get in the way of his devious scheme.* We urge the Court not to draw negative assumptions about Brant or submit to an attempt to flatten him into an oversimplified stereotype. There is a marked difference between someone who has lived a selfish, self-serving life with questionable motives and tactics and finally gets caught, and someone who has lived an upstanding and public-service oriented life but made a bad mistake in a desperate situation. Brant is the latter.

Brant Frost is 69 years old. He was born in Rye, New York but has lived the majority of his life in Macon and then Newnan, Georgia. He is a loving husband to Krista, his wife of 37 years, a devoted father to Brant V, Mary, Caroline, Lizzie, A[redacted] and a proud grandfather to E[redacted]. Brant "cares deeply about his family and his country." (Exh A. at 14).

Friends describe Brant as "soft-spoken," kind and thoughtful. He is a man who let his gestures speak louder than his words. (Exh. A at 120). There is no "pretentious bravado." (Exh. A at 72). He is "gentle, cordial, loving, and a friendly conversationalist" (Exh. A at 16) who "listens well, speaks with courtesy, and leaves those around him more at ease than he found them." (Exh. A at 125). He shows "the same respect and kindness to everyone he interact[s] with, whether it was a millionaire client or a member of [the local restaurant's] kitchen staff." (Exh. A at 91). "He has been a steady source of encouragement" to others, and he has been that way "consistently, across a long stretch of years and through changing circumstances." (Exh. A at 87).

It is also a mistake to think that Brant Frost's bad decision-making in this case is indicative of a person who sought to cheat or take shortcuts in life. To the contrary, he learned from his father and mother that hard, honest work lifts people up and is its own reward. Brant's father set that example by breaking with the Jim Crow laws when he sponsored the first black man for membership in the Macon-

Bibb Count Board of Realtors. His mother started and for 25 years ran Volunteer Macon; more than 600,000 volunteer hours were clocked under her leadership. And Brant followed in those footsteps for the overwhelming majority of his business and personal life.

Brant is a self-made man, with no college degree, who has never been afraid of hard work. He got his first job at 13 years old, delivering the newspaper to his neighbors, and he's been working non-stop ever since. He went from paper boy to work at the local Pig N' Whistle BBQ, then Burger Chef, and then the Winn Dixie grocery store. At only 16 years old, he became part-owner of the first pizza delivery parlor in Macon. Three weeks after he turned 18, he got a real estate license – among the youngest in Macon to ever do so – and started selling real estate with his father. He closed his first real estate deal before he turned 19 years old and stayed in the real estate business until he was 30. In 1993, after a brief sojourn into politics, Brant opened First National Mortgage, which would later become First Liberty.

Brant Frost believes service is the essential purpose of life; that we rise when we help to lift others. The letters submitted herewith illustrate a lifetime of helping strangers in need, the impoverished, the elderly and the infirm. Brant helped people he didn't know and who could offer him nothing. Some vignettes from

Brant's longtime friends and colleagues provide a fitting vantage point from whence to start understanding him.

Amy Wilson tells a revealing story about a local community event where she saw Brant speaking with the building janitor:

> [Brant] was speaking [to the janitor], and someone in a suit approached and interrupted to shake Brant's hand. Brant shook the man's hand briefly and then respectfully asked him to wait because he wanted to hear the janitor's story. I later learned that the person in the suit was a Senator. That moment, and many others over the years, reflected who Brant is at his core. (Exh. A at 124).

Joel Balin, a friend of 20 years, tells of Brant's bond with a blind man who was part of a local church group.

> For an extended period of time, [Brant] went considerably out of his way to pick this man up, bring him to our meetings, and return him home afterward. What impressed me was that Brant didn't simply provide transportation. He helped him become part of the group, stayed alongside him during the meetings, and made sure he was included and cared for.
>
> Doing this required a genuine sacrifice of Brant's time and freedom, and he continued doing it for someone who had nothing to offer him in return. (Exh. A at 6).

A banker friend of 20 years, William H. Gafford, Jr., regularly interacted with Brant on lending matters and observes that:

> Over the course of . . . two decades, I consistently found Brant to be professional, courteous, and respectful in our business dealings. He was prepared, responsive, and treated clients and business associates with dignity and professionalism. My interactions with him were always positive, and I never experienced conduct that caused me to question his integrity or his commitment to serving clients responsibly. (Exh. A at 51).

And Gary Pernice best sums up the difficult situation presented when a good man like Brant does wrong:

> I understand that a person's good qualities do not erase wrongdoing or repair the losses suffered by others. At the same time, I respectfully ask the Court to consider the whole of Brant's life: the years during which he encouraged, counseled, and assisted people; the relationships he formed; the kindness he extended; and his capacity for remorse, restitution, and constructive service. I believe he remains capable of doing meaningful good and of devoting the remainder of his life to making amends. (Exh. A at 102).

* * * * *

Humble as he is, Brant Frost has every reason to be proud of the work he did at First Liberty that predated his misconduct. Consistent with the lessons of service learned from his parents, Brant created First Liberty as a tool to provide for others. For years, First Liberty served the community and local citizens by helping scores of small businesses and small business owners acquire financing when they needed it most. And they did it lawfully, legally and legitimately. Some business owners needed financing to seed their dreams of growing their business by hiring more employees. Others needed money to help a struggling company stay afloat during hard times. Whatever the situation, Brant was viewed as someone who "would treat [people] honestly and make a sincere effort to help them." (Exh. A at 84). His work was "transformational for individuals, their families and small communities in poverty areas of the state." *Id*.

Several first-hand accounts demonstrate the commitment and integrity with which Brant Frost conducted First Liberty's business for decades.

Mike Hardin tells a moving story of Brant delivering for him in a time of great need. Mr. Hardin's concrete construction company got hit hard by the 2008 recession. (Exh. A at 60). It had to reduce its force from 600 employees to 60, it lost over $4 million, it had two properties foreclosed upon, and he couldn't borrow from the bank. *Id*. When Brant learned of the situation, he dedicated himself to "get[ting] the company healthy again," one small loan at a time. *Id*. According to Mr. Hardin, over a period of several years, Brant helped him "turn[] the company around." *Id*. Through Brant's tireless efforts, $4 million was raised, an SBA loan became available, and the company was saved. *Id*. Brant's hard work, creativity, and true commitment to serving others resulted in this small miracle.

V.T. Murray, a business associate for more than 20 years, describes Brant over the course of their many transactions as "forthright, ethical, professional and committed to doing what he believed was right." (Exh. A at 93). He recounts one situation where Brant found a solution for a client in "severe financial distress." *Id*. When Brant learned of the client's troubles, he "immediately immersed himself in the situation and successfully arranged a series of financing transactions that allowed the [client's] company to satisfy its existing lenders, keep multiple

locations operating, preserve jobs, and ultimately stabilize the business." *Id*. That is a quintessential example of Brant Frost's big heart.

Another longtime business colleague, Donny McKinney, echoes Mr. Murray's sentiments. In 2012, as the country was recovering from the financial crisis, Mr. McKinney was trying to start a propane gas distribution company. (Exh. A at 85). However, traditional lending options were quite limited at the time. *Id*. In stepped Brant Frost, who "worked diligently" to help Mr. McKinney secure bridge loan financing from two private investors and a bank. *Id*. The money enabled McKinney's propane business to open and eventually achieve wonderful things: it now serves over 5,000 customers in twelve counties and has provided stable jobs to the community and dependable propane service to thousands of families, farms, and businesses in the region. *Id*. According to Mr. McKinney, "none of this would have been possible" without the loyalty and devotion of Brant Frost. *Id*.

Brant's friend Paul Stengenga sums it up best:

> Over the decades, I personally witnessed Brant provide sound financial counsel and access to capital for healthcare and long-term-care projects that might otherwise have been overlooked or abandoned. He had a remarkable ability to look beyond the immediate financial transaction and understand what a project could mean to the people it would ultimately serve. His work helped create places where patients received care, where families found hope, and where older adults could live with dignity and community.

> Our most recent project together was a substantial senior-housing development for a faith-based organization in Georgia that provides charitable housing and services to retired pastors and church personnel, as well as affordable housing and services to others in the community.
>
> It is difficult to measure the value of that kind of contribution.
>
> How do you measure the value of helping provide a cancer patient access to leading-edge healthcare? How do you place a dollar value on giving an elderly widow or widower a safe home, a sense of belonging, and the dignity of living out the remainder of life in a caring community?
>
> Those are the things I have seen behind Brant's work. (Exh. A at 114).

What happened after Brant was forced to close First Liberty speaks volumes about the trust his community *still* places in him. Needing a job to provide for his family and begin to repay investors, Brant approached a friend, Joshua VanDusseldorp, and explained the position he was in, including the criminal charges he expected to face. He asked Mr. VanDusseldorp if there was anything he could do for Mr. VanDusseldorp's electrical contracting business to help make ends meet. Mr. VanDusseldorp "did not hesitate." (Exh. A at 120). He wanted to do "whatever I could to be a help to Brant as he had always been a help to me." *Id*. He offered Brant a position selling generators and "Brant has successfully worked that position from that time to this day." *Id*. According to Mr. VanDusseldorp, "Brant has a humble spirit and fit right in with our team. My team and myself love and appreciate his contribution." *Id*. Says Mr. VanDusseldorp of Brant: "I trust him. I trust him in business. I trust him as a friend." (Exh. A at 121).

* * * * *

Throughout his personal life too, Brant has practiced service. He has demonstrated uncommon dedication to his community and its most needy members. He has helped raise awareness and support for those in need and demonstrated "character, compassion and genuine concern . . . for the quality of life and well-being of others." (Exh. A at 8). Like many other community-minded citizens, Brant has "helped plan and support numerous rallies for middle school, high school and college-age students." *Id*. The events "addressed serious concerns such as illegal drug use, gang involvement, bullying, peer pressure and criminal activity." *Id*. He has helped to provide, food, coats, school supplies and book bags to those in need. But Brant has also gone farther, above and beyond, to exceptional lengths to serve his community. A few personal anecdotes stand out, among many, that reveal the true nature of Brant Frost's character.

Jay Adcock describes the support and assistance Brant provided when Jay's wife [redacted]. (Exh. A at 1). Brant provided assistance and encouragement to Jay and his family that "meant more to [the family] than [he] can put into words." *Id*. And "[e]ven now, as he walks through his own difficult season, he continues to be an encouragement to others. That is simply who he is." *Id*.

Carroll Conley, the retired Executive Director of the Christian Civic League of Maine, recalls getting a call from Brant "out of the blue":

> [Brant] was visiting Freeport, Maine, with his family and came across a homeless individual who was clearly in desperate need of help. Knowing no one in the state, Brant spent hours tracking down potential local resources to assist this person. Someone eventually directed him to me because of the organization I was leading at the time, the Christian Civic League of Maine. Brant's relentless effort and persistence on behalf of a total stranger ultimately led to a positive outcome for that individual. (Exh. A at 20).

Chris Brown, a former business colleague of Brant's, had fallen on hard times and was deep in the throes of addiction. Mr. Brown had lost his wife and family. Then he describes the following:

> Brant literally tracked me down, he didn't know my address or my phone number …. he heard I was in trouble and came back into my life and rescued me from the garbage heap of life ..... literally picked me up and carried me to church and encouraged me to get the help I so desperately needed. I was basically homeless…no job…divorced and honestly had no hope…..I made the decision to move to Alabama and join a recovery home…a 12 month program to get your life back on track. Brant highly encouraged me to follow through with this decision …in fact he was on my wife Tracy's side through all of this…he said I needed to step up and be a man and do the right thing by her and my daughter….Thank you Brant Frost!…for caring enough about your fellow man and tracking me down! Thank you for rescuing me! My wife Tracy and I remarried here in Alabama and we are a family together again…(Exh. A at 12).

Douglas Hill's experience with Brant is similar. Mr. Hill was a cook in a local restaurant near Brant's office at a time when Mr. Hill struggled with [redacted].

> There were times in my life when I felt like I had hit rock bottom because I struggled with [redacted]. I made mistakes. But Brant Frost was right there when I needed someone. He encouraged me and told me things would get better. He reminded me that I was better than the choices I was making, even when I felt low and ashamed.
>
> Brant connected me with [redacted], and not only did he connect me — he went with me to meetings to show support. I believe he wanted me to know that I wasn't in this struggle by myself. (Exh. A at 69).

Longtime friend Joel Balin tells of his experience with Brant:

> I [redacted] and, later, [redacted]. During a season when it would have been easy for me to become isolated, Brant helped rally other men around me. He reached out with encouragement and continued to express confidence in me…. Over the years I have known him, I have repeatedly seen Brant make himself available to encourage and support people around him. (Exh. A at 6).

Larry Matthews is the President and C.E.O. of Veterans' Inn and Resource Center, Inc. When his son – who Brant had never met – needed emergency surgery, Brant led a campaign to help pay for the surgery and his "credibility, hope, and momentum" helped "open the floodgates that made the surgery possible." (Exh. A at 82). When Mr. Matthews later lost his son unexpectedly to a brain aneurysm, Brant didn't just pay lip service, he gave real service.

> There are people who offer help as a courtesy; Brant followed through. His kindness to my family was not public, calculated, or performed for recognition. It came at moments when we were frightened, grieving, and in genuine need. I owe him a debt of gratitude that I cannot repay. *Id*.

Another friend of 30 years, Paul Schneider, Jr., tells of the time he approached Brant needing assistance:

> In 2009 I had a supplement that greatly helps those living with HIV. The opportunity opened up for me to send this to non-profits in 14 different countries, but I didn't have the funds to do so. Numerous times I went to Brant's office, requesting his help. Every time I left with the funds I needed to send this supplement to our partners overseas who worked with those with HIV. Brant saw the need and was quite eager to help. (Exh. A at 108).

The Pastor Emeritus of Coweta County Community Church, Peter H. Mullins summarizes Brant's service to the community:

> I have rarely encountered an individual who has had such a positive impact on a community. It would be difficult to find someone in Coweta County who has spent so much personal and professional virtue on behalf of others. (Exh. A at 92).

Courts credit these kinds of community and philanthropic efforts at sentencing, even for defendants convicted of far more serious crimes than Brant. *See, e.g., United States v. Mohamud*, No. 10-cr-4246 JM, 2021 WL 4460705, at *5 (S.D. Cal. Sept. 29, 2021) (court considered defendant's "substantial charity, education, and spiritual work in the community" in imposing 156-month sentence after conviction for providing material support to terrorists, rejecting life sentence recommended by the government and probation).

There can be criticism that Brant has not always practiced what he preached. He made purchases, investments and expenditures at a time and with funds that he should not have. He accepts that criticism. He deeply regrets those actions that

came at the expense of others, rather than in service to others. Still, he hopes to continue his servant leadership in the community when he gets on the other side of this recent, aberrational period in his life.

At 85 years old, Mr. Matthews offers valuable perspective on a person in Brant's position:

> … I have lived long enough to know that good deeds do not erase serious wrongdoing. I have also lived long enough to know that a grave mistake, even one with painful consequences, does not erase every act of compassion, faith, loyalty, and generosity that came before it. (Exh. A at 82).

## II. The Guidelines' Offense Level Overstates Brant's Culpability

Applying the § 3553(a) factors here, it is clear that Brant's offense level of 38 vastly overstates his culpability. That level is *higher* than would be assigned to the following defendants (each with a three-point reduction for acceptance of responsibility):

- Conspiracy or solicitation to commit murder involving the offer or receipt of anything of pecuniary value for undertaking the murder (U.S.S.G.§ 2A1.5);
- Drug trafficking conspiracy involving 3.99 kilograms of fentanyl, defendant possessed a firearm, used violence in connection with the offense, and distributed fentanyl to an individual under the age of 18 (U.S.S.G. § 2D1.1); and
- Kidnapper who abducted a victim for more than seven days and caused permanent or life-threatening bodily injury (U.S.S.G. § 2A4.1).

*Compare also United States v. Carpenter*, 803 F.3d 1224, 1233 (11th Cir. 2015) (holding 97-month sentence to be substantively reasonable in child pornography case where defendant downloaded the pornography for a year, possessed 4,800 images, including video depicting the rape of female toddlers, one of whom "was tied at the ankles and neck" and three of the videos "depicted minors engaged in sadistic and masochistic conduct").

Brant Frost wronged real people and real victims, but an offense level is fundamentally twisted that calls for him to receive a sentence as severe as, or more severe than, those of the defendants set forth above. The § 2B1.1 loss table is the culprit. It adds a 24-level increase for a loss between $65 million and $150 million. The calculations demonstrate the fundamental flaws that lie at the heart of the entire Guidelines regime. Senselessly harsh results under § 2B1.1's loss table are now recognized as commonplace. Take the following observations from the Honorable Lewis A. Kaplan of the Southern District of New York:

> The second thing I would say is that the loss table . . . is a debatable proposition. Any number of my colleagues have criticized it on various grounds. As I understand its genesis, there's really no empirical basis for the brackets assigned or for the assignment of different losses to different brackets. I share many of those criticisms and concerns with my colleagues. I have never regarded myself, once *Booker* was decided, as in any way bound by guideline computations that depend on the loss table in 2B1.1. I do not regard myself as bound by it now.

*United States v. Bankman-Fried*, No. 22-cr-00673-LAK, ECF No. 426, Sentencing Tr. at 6:14-25 (S.D.N.Y. March 28, 2024).

An esteemed list of former federal judges and prosecutors have also recently added to the criticism of the loss table. The practitioners noted § 2B1.1 "can often call for decades in prison even for first-time offenders whose fraud offense may have been driven by dire personal or professional circumstances and who may have shown great remorse for their wrongdoing and are eager to make amends for harms caused." Exh. B at 1. The authors also commented "these myriad problems with the Guidelines' heavy reliance on loss are further compounded in those cases where calculations of loss end up having little or no relationship to either economic realities or an offender's actual personal gain from an offense." *Id*. at 2.

"The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.). One District Judge summarized—accurately, we submit—as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to

sentencing judges." *Id*. at 380. Therefore, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id*. at 379. *See also United States v. Faulkenberry*, 759 F. Supp. 2d 915, 928 (S.D. Ohio 2010), *aff'd*, 461 F. App'x 496 (6th Cir. 2012) (imposing a variance and a ten-year re-sentence in a case involving a $2.4 billion fraud, "among the worst in history by a privately-held corporation," noting that it is "common" for district courts to find in financial fraud cases that the loss calculation substantially overstates the gravity of the offense).

Indeed, the loss table that drives this calculation is itself about to change. On April 16, 2026, the United States Sentencing Commission voted to amend § 2B1.1's loss table to adjust its monetary thresholds for inflation, effective November 1, 2026. If Brant were sentenced only six days later than his current sentencing date, his loss would fall within a lower tier and his offense level would be reduced accordingly. Under the amended table, the threshold for a 24-level increase rises from $65 to $90 million, so Brant's stipulated loss would instead draw a 22-level increase, yielding an adjusted offense level of 36 and an advisory range of 188 to 235 months. Judges in this District have already granted downward variances to account for this imminent amendment. *See, e.g.,* Minute Entry for Sentencing Hearing, *United States v. Shull*, No. 1:25-CR-29-JPB-CMS-1 (June 16, 2026), ECF No. 143; Minute Entry for Sentencing Hearing, *United States*

*v. Williams*, No. 1:25-CR-68-VMC-RDC-2 (July 21, 2026), ECF No. 129; Minute Entry for Resentencing Hearing, *United States v. Barry*, No. 1:21-CR-385-ELR-JSA-5 (June 30, 2026), ECF No. 300. The Court should apply the same reasoning and vary downward so that Brant is not punished more severely merely because of the timing of his hearing.

At a minimum, the Court should take into account the widespread criticism of § 2B1.1 as part of the Guidelines' substantial overstatement of Brant's culpability under § 3553(a). *See, e.g.*, *United States v. Mueffelman*, 400 F. Supp. 2d 368, 378–79 (D. Mass. 2005), *aff'd*, 470 F.3d 33 (1st Cir. 2006) (granting variance to defendant where "losses generated by [his] businesses are not the complete, much less the fair, measure of his culpability" because he was "consistently optimistic about his chances of getting financing for his clients in time to meet his obligations."); *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3-4 (E.D.N.Y. Apr. 27, 2018) (describing loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding . . . the lack of any consideration of danger to society"); *Adelson*, 441 F. Supp. 2d at 512 ("the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense.");

Brant's advisory Guidelines range is constrained by the 20-year (240-month) statutory maximum on the single count of conviction. *See* 18 U.S.C. § 1343; U.S.S.G. § 5G1.1(a). Before the reduction for acceptance of responsibility, Brant's offense level of 41 would yield an advisory range of 324 to 405 months—well above that cap—the statutory maximum compresses the post-acceptance range of 235 to 293 months to 235 to 240 months; *see* U.S.S.G. § 5G1.1(c)(2), leaving the three-level reduction under § 3E1.1 worth, at most, five months. The Eleventh Circuit has recognized that in precisely this circumstance a sentencing court may adjust downward to give the defendant the genuine benefit of his acceptance of responsibility. *See United States v. Blanco*, 102 F.4th 1153, 1167-68 (11th Cir. 2024); *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995). Moreover, as shown herein, *infra*, Brant's acceptance has been extraordinary.

While the Court may be required to assess the Guidelines, the Guidelines here are draconian under the facts of this case as to this defendant, and accordingly we respectfully request the Court temper justice with mercy and impose a sentence not greater than necessary. *See Peugh v. United States*, 569 U.S. 530, 536 (2013) ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views[.]'") (citation omitted). Five years is that sentence.

### III. Brant's Acceptance Of Responsibility Was Early and Extraordinary and Shows True Remorse and Post-Offense Rehabilitation

The Court should take into consideration under § 3553 that Brant Frost's acceptance of responsibility was early and extraordinary and his rehabilitation has begun. He is the rare defendant who candidly admitted his guilt right up front, promptly resolved his cases with the SEC and the DOJ without contest, and has taken every possible step to facilitate relief for the victims and rehabilitate himself. These factors warrant a variance. *See, e.g., United States v. Malone*, No. CR 08-00776 EMC, 2012 WL 762000, at *6 (N.D. Cal. Mar. 7, 2012) (government acknowledged that defendant showed "'extraordinary acceptance of responsibility'" when he pleaded guilty and allowed the government to divert its time and resources to other matters and provided letters from his wife, daughter, brother, and friends that showed his potential to be productive, and participated in classes and programs while in custody to better himself through education and rehabilitation); *United States v. Clay*, 483 F.3d 739, 746 (11th Cir. 2007) (extraordinary post-offense rehabilitation efforts supported downward adjustment).

As noted above, Brant closed down First Liberty of his own accord. He immediately consented to the relief sought by the SEC, including an asset freeze and the appointment of a receiver, avoiding protracted legal proceedings and a delay in resolution for those who suffered losses. Then, before any criminal charges were filed, Brant initiated discussions with the U.S. Attorney's Office and

the FBI in order to save the government the trouble of undertaking what would have been a lengthy and complicated criminal investigation. Beyond that, he twice met with the prosecutor and investigators to explain and discuss his conduct and admit his wrongdoing. Thereafter, he waived indictment and agreed to plead guilty, no doubt saving an under-staffed U.S. Attorney's Office enormous amounts of time and resources. His Plea Agreement also contains a cooperation provision and although we understand no 5K letter or Rule 35 motion will be forthcoming, Brant has always stood ready, willing and able to cooperate if the government so requests.

And Brant Frost didn't just talk the talk. He walked the walk. He did something remarkable, that very few defendants do when they still face legal jeopardy. Brant issued a public apology to those he hurt:

> *"I take full responsibility for my actions and am resolved to spend the rest of my life trying to repay as much as I can to the many people I misled and let down . . . I will be cooperating with the receiver and federal authorities and ask that everyone allow the receiver time to sort things out and do his best to repair the damage I created."*

Jeff Amy, *Georgia Republican apologizes for $140M Ponzi scheme as judge freezes assets,* Associated Press (July 11, 2025), https://apnews.com/article/brant-frost-iv-ponzi-scheme-first-liberty-80922ed266e203bd77ed1a5c4244d482.

Since his arraignment and release on bond, Brant has maintained 100% compliance with his bail terms. This demonstrates the Court's ability to trust him

to avoid even the appearance of any further misconduct. He has also sought counseling from clergy and various professionals.

And there's more. When First Liberty closed, Brant secured employment selling generators, in the hopes that he could start earning some money with which to support his family and repay investors. He vows to do everything he can in that regard if given the chance. *See, e.g.*, *United States v. Walker*, 252 F. Supp. 3d 1269 (D. Utah 2017), *aff'd*, 918 F.3d 1134 (10th Cir. 2019) (granting substantial variance on resentencing in case of exceptional "gravity" where victims can experience "terror," noting, among many other considerations, that incarceration would prolong the completion of restitution); *Adelson*, 441 F.Supp.2d at 514 ("In the case of financial fraud . . . an important kind of retribution may be achieved through the imposition of financial burdens").

It is apparent to all that Brant "faces sentencing as a deeply repentant offender.. . . He has acknowledged the painful and costly consequences of his poor choices and their terrible impact on many who invested their funds." (Exh. A at 47). He "makes no excuses" for his conduct. (Exh. A at 121). He feels tremendous "remorse" and a "desire to make amends." (Exh. A at 111). His friends "know that he is determined to take every step necessary to show and demonstrate the Godly and law-abiding man we all know him to be." (Exh. A at 79).

At sentencing, Brant will stand before the Court "with a contrite spirit" (Exh. A at 40) that has been noticed by those who've come into contact with him. Pastor Harry Parkerson had a frank conversation with Brant: "The pastor said he admired Frost's contrition." Jeremy Redmon, *Who is First Liberty founder Brant Frost IV?*, Atlanta J.-Const., July 20, 2025, https://www.ajc.com/news/2025/07/who-is-first-liberty-founder-brant-frost-iv/.

Eric and Debbie Coloney, friends of 35 years report:

> "A few months ago, Brant spoke with us about the case. He expressed profound remorse for his failures and the damage he caused. He conveyed sincere regret for harming people who trusted in him and shared his earnest desire to restore what was lost and make right the wrongs committed. That moment revealed to us a person confronting his mistakes with honesty and accountability." (Exh. A at 18).

Brant's family knows him better than anyone else. Writes his daughter A[redacted]:

> My father has made mistakes in his life. He has had moments he could have handled differently, decisions he may wish he had made another way, and things he has had to learn along the way. But one thing I respect about him is his willingness to take accountability for his mistakes. (Exh. A at 33).

His sister-in-law, Kem Frost, served as a judge in Texas for 22 years. She observes that:

> "Beyond accepting full responsibility for his actions . . . Brant longs to put things right. He has spent time thinking through his vision for the next season of his life and how he can do good during and after [any] period of incarceration to somehow make amends …He knows the best

> apology is changed behavior, and he has taken concrete steps to move forward and plan for the time ahead." (Exh. A at 47).

His brother Fred, a lawyer, writes of Brant's "[r]edemptive resolve." Fred informs that Brant plans to use his time in prison to serve others as a teacher in GED and other educational programs. According to Fred,

> "He has applied to Adams State University's Prison Education Program to complete his undergraduate degree, so that he can pursue a teaching certificate. Though Brant cannot be officially admitted to the Adams State program until he is incarcerated, he already has submitted his letter of intent, application, transcripts, and other paperwork so that he can be admitted and begin his coursework immediately upon incarceration. More than merely offering an apology with words, Brant wants to redeem his wrongdoing with action." (Exh. A at 41).

Fred concludes: "I know that Brant will not rest until he has seen some good happen as a result of his time in custody." *Id*.

These assessments demonstrate real rehabilitation, authentic remorse, and exceptional acceptance of responsibility that support a substantial variance. *See United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (even though defendant's "rehabilitation only came after an encounter with law enforcement, her rehabilitation appeared genuine, and she [was] a positive contributor to society through her extraordinary work with persons with disabilities."). Brant knows he caused a huge problem and he is eager to be part of the solution.

## IV. The Prosecution and Its Collateral Consequences Have Already Imposed Significant Punishment

A court, when imposing sentence, should consider the collateral consequences of the defendant's conviction. Indeed, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). In that regard, Brant has suffered, and will continue to suffer, significant collateral consequences as a result of his conviction.

Brant Frost has already been, and will continue to be, punished, wholly apart from any prison sentence the Court imposes. As a threshold matter, for Brant Frost, a conviction in itself imposes serious punishment. He has no prior criminal history; the status of "convicted felon" therefore delivers a significant blow. That status itself is a major punishment in this case—more than sufficient to satisfy many of the statutory requirements. Moreover, he will suffer the usual collateral consequences of a felony conviction, under both state and federal law. He will lose, for example, his right to vote, his right to hold office, his right to sit on a jury and perhaps his ability to obtain various professional licenses.

More particularly, Brant "has experienced ruin in a way he never would have imagined. He has lost his business, his livelihood, and his reputation." (Exh. A at 48). First Liberty closed its doors after 32 years, and with it ended all that had been Brant's life work. His reputation, once a source of standing in his

community, now lies in tatters. *See Stewart*, 590 F.3d at 141 (conviction "made it 'doubtful that the defendant could pursue' his [prior] career . . . and therefore . . . the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment'") (citation omitted). This loss is excruciating for a man who loved his work. And soon he will lose his freedom. All of this "makes his punishment unavoidably severe and long-lasting regardless of the length of the sentence he receives." (Exh. A at 48). Courts around the country have recognized that consequences like these constitute punishment.[1]

[1]*See, e.g.*, *United States v. Sponaugle*, Case No. 19-103-LPS, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on the defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence, in part, because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant suffered loss to his professional reputation and lost his high-paying job); Transcript of Sentencing Hrg., *United States v. Jasen*, 8:15-CR-00214-JDW-TBM (M.D. Fla. Jan. 28, 2016), ECF No. 191 at 84-85 (imposing probation because, in part, "one who makes a mistake in judgment . . . should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted . . . which will . . . harm your reputation, your social status[]"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence, in part, because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence, in part, because, "as a consequence of his conviction and sentence, defendant lost a good public sector job, a factor not

Finally, a particularly ugly collateral consequence of this conviction is that Brant, his wife and his children have been subjected to non-stop, vicious and cruel attacks in the mainstream news media, in innumerable podcasts and on the internet. Brant understands that critical reporting about his case and his conduct is warranted. Baseless, personal attacks on his wife and children, which will live online forever, are a brutal form of punishment he will endure for the rest of his days.

## V. Deterrence

This case has already achieved the sentencing objectives of specific and general deterrence.

Brant is no longer in any position to commit fraud of this kind. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (defendant "yielded to a temptation and committed a crime particularly adapted to his chosen career. That career is over, and his potential to commit this particular type of crime has been eliminated."). He is keenly and painfully aware that he has,

---

considered by the Guidelines."); Transcript of Sentencing Hrg., *United States v. Anghaie*, 1:09-CR-00037-MW-GRJ (N.D. Fla. Nov. 29, 2011), ECF No. 238 at 34 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation).

through criminal conduct, seriously hurt people he loves. Indeed, he has jeopardized the basic welfare of his family. His livelihood is gone. His wife and children are in economic peril, which pains him greatly. The case has also damaged his community, both emotionally and financially. These are pains, profoundly felt, that Brant never wants to suffer, or inflict, again. For Brant, this whole awful ordeal is something that serves as a constant reminder to do better going forward. Those who know Brant agree that this very public and painful experience has made an indelible, lifelong impression on him that accomplishes much of what the criminal justice system is designed to achieve.

Under the circumstances, there is no reason whatsoever to believe Brant will re-offend. Unsurprisingly, neither the PSR nor the government suggests he will commit further crimes. The criminal law has therefore already achieved its deterrence objective. *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time . . . constitutes a source of both individual and general deterrence[]"), *aff'd*, 31 F.3d 73 (2d Cir. 1994); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and

law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.”).

General deterrence has also been satisfied. We are mindful that “[g]eneral deterrence is more apt, not less apt, in white collar crime cases.” *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022). Importantly, there is “considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective ‘white collar’ offenders.” *Adelson*, 441 F. Supp.2d at 514 (citing Richard Frase, *Punishment Purposes*, 58 Stan L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1999); and a United States Sentencing Commission report).

The letters submitted by Brant’s community in Georgia reflect that his community is well aware that misconduct of this nature carries with it severe penalties and consequences. *See, e.g., United States v. Hendrick*, No. 04-10009-CR-ZLOCH, 2009 WL 10709763, at *3 (S.D. Fla. Sept. 23, 2009) (“This case has garnered wide media attention . . . those in similar positions now know that they have grave reason to avoid any type of criminal conduct. [Defendant] has lost his [livelihood], has felony convictions, and faces the onerous burdens that this sentence imposes upon him”); *Gaind*, 829 F. Supp. at 671 (“Others engaged in similar activities or considering engaging in them have doubtless already learned

through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.").

Moreover, a sentence well below the advisory Guidelines range can still achieve the objective of general deterrence. For example, in *United States v. Del Campo*, 695 F. App'x 453, 458–59 (11th Cir. 2017), the Court imposed a sentence of home confinement and supervised release, against a 46-57 Guidelines range, on a defendant who was a 71-year-old attorney and first-time offender and it did so notwithstanding that the defendant failed to express "the contrition that [the district court] expected to hear." *Id.* at 459. The government maintained that a greater sentence was necessary in order to send a "message." *Id.* at 458. On appeal, the Eleventh Circuit held that the sentence was not substantively unreasonable in light of the Court's consideration of the other 3553 factors and the fact that:

> the sentencing guidelines and statutory sentencing provisions—and the frequency with which district courts hand down sentences well within the advisory ranges—send a clear message that the presumptive penalty for bank fraud is imprisonment. Whether [the defendant] personally receives a sentence of probation surely cannot meaningfully affect whether would-be criminals—again, assuming they act rationally in determining whether to commit crime in the first place—decide that their own potential criminal activity is worth the risk of being caught and punished.

*Id.* at 459.

Other courts have ruled similarly. Judge Nicholas Garaufis commented in *United States v. Johnson*, that "any amount of prison time is a serious amount of

prison time" and therefore even a lenient sentence, "combined with the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient . . . to effect general deterrence." *Johnson*, 2018 WL 1997975, at *5 (24-month sentence for guidelines range of 87-108 months). *See also* Transcript of Sentencing Hrg., *United States v. Martoma*, No. 12-cr-973 (PGG) (S.D.N.Y. Sep. 17, 2014), ECF No. 318 at 41-43 (nine-year sentence sufficient for insider trading scheme that generated $275 million in profits and $9 million bonus for defendant with Guidelines range of 188 to 235 months).

Accordingly, there can be little doubt that general deterrence will be effected in this case, even with a substantial variance.

## VI. The Need To Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" "[T]he need to avoid unwarranted sentencing disparity ... requires the [district] court to consider other similarly situated defendants ... who were convicted of similar crimes." *United States v. McQueen*, 727 F.3d 1144, 1160 (11th Cir. 2013).

First, United States Sentencing Commission data shows that lengthy terms for fraud under U.S.S.G. § 2B1.1 are the rare exception, not the rule, including in

this Circuit. For fiscal years 2015 through 2025, the average sentence imposed under § 2B1.1 in the Eleventh Circuit was 30 months, with a median of 21 months, and the figures for Criminal History Category I defendants were lower still with an average sentence of 26 months and a median of 15 months. For Zone D defendants over sixty years old, the average sentence length is 39 months and the median is 30 months. For fiscal years 2015 through 2025, only 3.8% of Criminal History Category I § 2B1.1 defendants over the age of 60 in the Eleventh Circuit received a sentence of between 10 and 20 years. See U.S. Sent'g Comm'n, Interactive Data Analyzer, https://ida.ussc.gov (last visited October 14, 2026).

Many defendants in high-dollar fraud cases around the country have engaged in conduct far more serious than Brant's and still received more lenient treatment than the Guidelines and the government recommend here. Consider the outcome in *United States v. Gentile,* No. 21-cr-00054-RPK-PK (E.D.N.Y.). *See* Press Release, Dep't of Justice, *Former Private Equity Executives Sentenced to Prison* (May 9, 2025), https://www.justice.gov/usao-edny/pr/former-private-equity-executives-sentenced-prison. Gentile was convicted of running a $1.6 *billion* Ponzi scheme that victimized more than 10,000 investors – more than twenty times the losses in Brant's case. According to the government, Gentile also pressured a witness to lie. Gov't Sentencing Letter, *United States v. Gentile*, No. 21-cr-00054-RPK-PK, ECF No. 539 at 5. Unlike Brant, Gentile proceeded to trial on securities

and wire fraud conspiracy and substantive counts, and was convicted on all counts. He faced an offense level of 43, including an aggravating role enhancement, and a Guidelines range of 1,020 months. Prosecutors sought 15 years in prison. Yet Gentile was sentenced to 84 months, a 92% downward variance from the Guidelines range. Judgment, *United States v. Gentile*, No. 21-cr-00054-RPK-PK (E.D.N.Y. May 13, 2025), ECF No. 596. Although Gentile's sentence was later commuted through executive clemency, the 84-month term reflects the sentencing court's own § 3553(a) judgment, which is the relevant measure for disparity purposes. It seems unfathomable that Brant Frost should be treated more harshly.

*United States v. Nadimpalli* is also instructive. In its sentencing memorandum in that case, the government explained Nadimpalli "lied about the success of his artificial intelligence startup, SKAEL, to convince venture capital firms, angel investors, and friends and employees to invest over $40 million in his company." Gov't Sentencing Memo, *United States v. Nadimpalli*, No. 24-cr-00021-CRB, ECF No. 22 at 1 (N.D. Cal. Oct. 31, 2025). Specifically, Nadimpalli "doctored bank statements and other documents to make it appear that SKAEL had subscriptions adding up to $7 million in annual recurring revenue ("ARR") when, in reality, SKAEL's ARR was less than $200,000." *Id.* Despite Nadimpalli's Guidelines range of 63 to 78 months, the government recommended only 18 months on account of his "clear and early acceptance of responsibility." *Id.* The

government explained that such a sentence would be a "just punishment" that would reflect the seriousness of Nadimpalli's conduct, provide adequate deterrence, and avoid unwanted sentencing disparities. *Id*. The court sentenced Nadimpalli to a year and a day, an 81% reduction from the low end of his Guidelines range. Judgment, *United States v. Nadimpalli*, No. 24-cr-00021-CRB, ECF No. 27 (N.D. Cal. Nov. 17, 2025); *see also* Gov't Sentencing Memo, *United States v. Matthews*, Case No. 18-cr-00048-VAB (D. Conn. 2023), ECF No. 221, and Transcript of Sentencing Hrg., ECF No. 230 (57% variance and 65-month sentence for defendant who pleaded guilty to fraud, money laundering, and tax evasion schemes spanning more than a decade, including theft of millions of dollars from vulnerable EB-5 investors which was used to purchase a $5.3 million home, a yacht, and several luxury vehicles, with offense level of 34 and advisory range of 151 to 188 months); Gov't Sentencing Letter, *United States v. Cole*, No. 19-cr-00869-ER (S.D.N.Y. Oct. 4, 2023), ECF No. 312 at 8-9 (18-month sentence, 77% downward variance for public company CEO convicted of what the government described as "a calculated, long-running and sophisticated accounting fraud scheme" based on round-trip transactions, inflated prices, secret side deals and the CEO's sale of $40 million worth of stock during the scheme).

This Court should resist any temptation to compare this case to *United States v. Burkhalter*, No. 1:26-CR-002-TRJ (N.D. Ga.). The lead defendant in that case

was sentenced to 20 years in prison, the maximum under law in that case. Beyond the fact that both cases have been characterized as Ponzi schemes and took place in the general Atlanta area, the cases are readily distinguishable. Burkhalter's conduct was far more reprehensible. Some of the clearest distinctions:

- According to the government, Burkhalter orchestrated a years-long Ponzi scheme that resulted in thousands of investors losing approximately $380 million. https://www.justice.gov/usao-ndga/pr/drive-planning-fraudsters-sentenced-federal-prison-operating-massive-380-million-ponzi. Without diminishing the serious nature of Brant's misconduct, it is nothing near Burkhalter's level.

- Burkhalter's conduct was brazen from the outset; he operated his "Real Estate Acceleration Loan" opportunity or "REAL," as a Ponzi scheme "from the inception." *Id.* Brant, on the other hand, ran an upright and honest business for decades before his misconduct.

- Burkhalter continued to solicit tens of millions of dollars in investments even after the SEC began investigating. *Id.* Brant voluntarily shut his business down and promptly offered to cooperate with the government.

- Burkhalter submitted nine letters in support of his character at sentencing. Brant submitted more than 80.

Finally, Burkhalter is 55 years old and may well survive a 20-year term. At 69 years old, with a family history of early male death and each year in prison reducing an individual's life expectancy by about two years, https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/, a term anywhere near the government's 14-year recommendation would make it likely Brant never comes home.

In that vein, it is important to note Brant Frost, when incarcerated, will rank among the oldest inmates in federal prison. *See* Federal Bureau of Prisons, Inmate Age Statistics, https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last visited Oct. 14, 2026) (only 3.2% of federal prisoners for all offenses are age 65 or older). The non-profit, non-partisan Prison Policy Initiative writes:

> Prisons are unhealthy places for anyone of any age, but keeping older adults locked up is particularly dangerous. A robust body of research shows that incarceration itself accelerates aging: people face more chronic and life-threatening illnesses earlier than we would expect outside of prison, and physiological signs of aging occur in people younger than expected. … Years of limited resources, inaccessibility, and understaffing in prison healthcare have created a situation in which each year spent in prison takes two years off of an individual's life expectancy. The same scarcity of prison healthcare resources that jeopardizes older people's health is not just ineffective-it's also exorbitantly expensive.

Emily Widra, *The aging prison population: Causes, costs, and consequences* (Aug. 2, 2023), https://www.prisonpolicy.org/blog/2023/08/02/aging/.

Not only would imprisonment come at a potential cost to Brant's health, but it would also come at a cost to the public. A 2015 report by the Office of Inspector General, U.S. Department of Justice found that "aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs" and that "limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates." The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates.

Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015, revised Feb. 2016), https://oig.justice.gov/sites/default/files/reports/15-05.pdf.

Accordingly, there can be no question that a five year sentence will pose a reduced risk to Brant's health and longevity and will be far less expensive to the public than a lengthy term of imprisonment.

**CONCLUSION**

A sentence of five years, rather than a longer term of incarceration, can work to promote the sentencing goal of respect for the law. It will illustrate a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing. *Gall v. United States*, 552 U.S. 38, 54 (2007). We offer the poignant words of two former judges:

John S. Martin, a former District Judge, recently addressed "the overly long sentences that are being imposed every day in our federal courts on nonviolent offenders." John S. Martin, *Cruel But Not Unusual: The Sentence Recommended for Sam Bankman-Fried,* New York Law Journal (March 12, 2024), https://www.law.com/newyorklawjournal/2024/03/12/cruel-but-not-unusual-the-sentence-recommended-for-sam-bankman-fried/.

> Our extremely long prison sentences are one of the reasons the United States has the largest prison population in the world. We have lost all

> sense of how horrible it is to spend even one year in prison, far away from family and friends, where every moment of existence must be lived under prescribed rules enforced by people who do not respect you and whom you do not respect and under constant fear of an unprovoked attack by another inmate. When you compare [past, more moderate sentences with present sentences] it becomes clear how irrational our sentencing system has become.
>
> Let us start the comparison with Charles Ponzi, for whom the Ponzi scheme is named. Ponzi operated a scheme in which investors were sold securities and promised a high return. The investors received the promised returns, but they were being paid with money obtained from new investors. Investors lost over $20 million, more than $200 million today, and six banks failed. Ponzi, who was prosecuted for mail fraud served three and a half years in prison (see Mary Darby, "In Ponzi We Trust", Smithsonian Magazine, December 1998 (updated April 14, 2021)).

Kem Frost, Brant's sister-in-law and a former Texas judge, writes:

> Many believe that justice defeats itself by a punishment that is so loaded with harsh effects that it crushes the redemptive spirit in the heart of a repentant offender. With so much now lost and so many challenges ahead, Brant's redemptive spirit has become his greatest asset – the fuel that runs the engine of his atonement. Protecting that asset by tempering the period of incarceration with a heavy dose of community service would serve the public, honor the purposes of punishment, and elevate the ends of justice more than a sentence that prioritizes retribution. (Exh. A at 48).

* * * * *

Brant Frost deserves punishment. He does not deserve a death sentence. His remarkable history, utter lack of malice, extraordinary community service, and exceptional acceptance of responsibility should earn him a measure of mercy at sentencing. "Mercy is seldom included on the list of 'traditional' rationales for sentencing. It is, however, evinced by the federal sentencing statute, 18 U.S.C. §

3553(a), which provides . . . that the lowest possible penalty consistent with the goals of sentencing be imposed." *United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998) (citing *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom")). "The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route." *Blarek*, 7 F.Supp.2d at 210. In the words of one of the victims in this case: "Justice served with mercy is always appropriate." ([redacted] VIS).

We could not agree more. It is unnecessary to imprison Brant Frost past his 75th birthday to fulfill the aims of the criminal law.

For the foregoing reasons, Edwin Brant Frost IV respectfully requests that the Court impose a term of imprisonment of five years, plus restitution (at a later date) and supervised release.

Dated: October 19, 2026

By: /s/ Marc L. Mukasey
Marc L. Mukasey (admitted *pro hac vice)*
Torrey K. Young (admitted *pro hac vice)*
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500
mmukasey@seyfarth.com
tkyoung@seyfarth.com

and

By: /s/ Nicholas A. Lotito
Nicholas A. Lotito
LOTITO & KIRSCHENBAUM
1800 Peachtree St. NW, Suite 300
Atlanta, Georgia 30309
(404) 565-1200
nick@nlsklaw.com

*Counsel for Defendant*
*Edwin Brant Frost IV*

## CERTIFICATE OF SERVICE

This is to certify that on this 19th day of October, 2026, I electronically served a copy of Defendant Edwin Brant Frost's Sentencing Memorandum using the CM/ECF system upon all counsel of record in this matter.

/s/ Marc L. Mukasey
Marc L. Mukasey (admitted *pro hac vice)*