IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*v.*<br>EDWIN BRANT FROST IV | Criminal Action No.<br>3:26-CR-008-LMM |

**United States' Sentencing Memorandum**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Angela Adams, Assistant United States Attorney for the Northern District of Georgia, files this Sentencing Memorandum to assist the Court in sentencing defendant Edwin Brant Frost IV. Pursuant to the plea agreement, the United States asks that the Court impose a sentence of 168 months (14 years) of imprisonment, to be followed by three years of supervised release. This sentence will provide an appropriate punishment for the instant offense without being greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**Background**

**A. Frost Operated a Massive Ponzi Scheme**

Frost orchestrated a large-scale investment fraud through his company, First Liberty Building and Loan, LLC ("First Liberty"), ultimately causing over $76 million in loss to over 300 victims. (Presentence Investigation Report ("PSR") ¶¶ 8, 9, 14, 36). Frost held First Liberty out as a Christian, conservative, lender committed to helping small businesses. (*See* PSR ¶ 9; victim impact statements). In reality, by at least 2021, First Liberty was operating as a classic Ponzi scheme

where Frost repeatedly misrepresented the nature of the business, the status of the underlying loans, and the source of investor returns. (PSR ¶¶ 10–11). He also used millions of investor dollars for his own personal enrichment. (PSR ¶¶ 14–18).

Throughout the scheme, Frost told investors that their funds would be used to make short-term, high-interest "Bridge Loans" to small businesses, and he promised returns between 8 and 18 percent, paid monthly. (PSR ¶ 9). He assured investors that their principal and interest would be repaid through Bridge Loan borrowers' eventual refinancing—often through SBA-backed loans—and he claimed First Liberty would earn revenue solely from origination and related fees as well as interest-rate spreads. (*Id.*).

By at least 2021, however, First Liberty had ceased generating enough revenue to meet its obligations. (PSR ¶ 10). Numerous Bridge Loans had defaulted, Bridge Loan borrowers had stopped making payments, and the company no longer had sufficient legitimate business income to pay interest to investors. (*Id.*). Instead of disclosing these failures, Frost reassured investors of the company's success, falsely claiming that First Liberty was using 100 percent of their money to fund Bridge Loans, that the loans were performing, and that only a few had defaulted. (PSR ¶¶ 10–12). He also represented that Bridge Loan borrowers had already received SBA preapproval, when few, if any, had. (PSR ¶ 11).

To conceal that his business was failing, Frost engaged in a full scale Ponzi scheme. He began using new investor funds to pay interest owed to existing investors. (PSR ¶ 12–13). That is, investor returns were derived largely from new

investments, not from borrower repayments. (*Id.*). Frost solicited new investors (and encouraged existing investors to re-invest), knowing that First Liberty's ability to stay afloat depended on attracting fresh capital. (*Id.*). Frost never disclosed that investor funds were being diverted to pay other investors. (*Id.*).

While investors were being misled about the true condition of First Liberty, Frost diverted at least $5 million of investor funds for his own personal benefit. (PSR ¶¶ 14–18). While First Liberty was crumbling and investors' lives were being ruined, Frost spent investor money on frivolities: a $230,000 vacation home rental in Maine; more than $140,000 in jewelry purchases; a $20,800 Patek Philippe watch; over $335,000 paid to a rare coin dealer; more than $2 million in credit card payments; and more than $570,000 in ego- and clout- boosting political contributions. (PSR ¶ 14).

Frost also funneled investor money to entities related to himself or First Liberty, including more than $630,000 to First Liberty Capital Partners LLC, $1.1 million to First National Investments LLC, $460,000 to MyHealthAI Capital LLC, nearly $200,000 to The Legacy Advisory Group Inc., and approximately $8.3 million to The Liberty Group LLC. (PSR ¶ 15).

**B. Charges and Plea Agreement**

While being investigated by the Securities Exchange Commission for civil securities violations, Frost, through his attorneys, contacted the U.S. Attorney's Office and expressed his desire to resolve any potential criminal charges. On April 23, 2026, Frost waived indictment and was charged in a one-count Criminal Information with wire fraud, in violation of 18 U.S.C. § 1343. (Doc. 1).

On May 12, 2026, Frost pleaded guilty. (Doc. 12). In the plea agreement, the United States and Frost agreed that:

- the applicable base offense guideline is U.S.S.G. § 2B1.1(a)(1), which yields a base offense level of 7;
- the amount of loss resulting from the offense(s) of conviction and all relevant conduct is more than $65,000,000 but less than $150,000,000, which yields a 24-level upward adjustment pursuant to § 2B1.1(b)(1)(M);
- a 6-level upward adjustment should be applied pursuant to § 2B1.1(b)(2)(C) because the offense resulted in financial hardship to 25 or more victims; and
- a 4-level upward adjustment pursuant to § 2B1.1(b)(20)(A) should be applied because the offense involved a violation of securities law and, at the time of the offense, Frost was an investment advisor.

(Doc. 12-1).

The United States agreed to recommend a sentence of 168 months' imprisonment.

**C. Probation's Calculated Guidelines Range**

Probation determined that the Guidelines stipulated to by the parties in the plea agreement applied and found no other adjustments, yielding a total adjusted offense level of 38. With a criminal history category I, the Guidelines range calculated by Probation is 235 to240 months (which is the statutory maximum). While the parties each made factual objections, neither party objects to the Guidelines calculation.

## Discussion

The statutory factors found in 18 U.S.C. § 3553(a) support the United States' requested 168-month sentence. The sentence, which results in a downward variance from the advisory Guidelines range, takes into account both the mitigating factors—including that Frost waived indictment, took accountability, and resolved his case early—and aggravating factors of § 3553(a). Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment," "to afford adequate deterrence to criminal conduct," and "to protect the public," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense

Wire fraud is a serious felony offense, punishable by up to 20 years' imprisonment. And, here, Frost's Guidelines range reaches that statutory maximum. Thus, there can be no doubt that Frost's offense was serious, warranting a significant prison sentence. Frost's scheme was large-scale, deliberate, and deeply deceptive. It resulted in a loss of over $76 million, victimized over 300 investors, and devastated the lives of many, including seniors and retirees. He promised stable, high-yield investments in short-term Bridge Loans that he repeatedly misrepresented as performing and low-risk. The offense was not a momentary lapse in judgment or a single bad decision; it was a sustained and calculated fraud in which Frost continued soliciting new

investments (and inducing existing investors to re-invest) long after he knew First Liberty was failing and that he was operating as a Ponzi scheme.

A particularly aggravating aspect of Frost's conduct is the way he targeted and manipulated investors by invoking religious and political identities. Frost marketed First Liberty not merely as an investment opportunity, but as a faith-based venture for like-minded individuals. He courted religious and political circles portraying himself as someone who shared their faith and worldview. He used religious language and political buzzwords not only to recruit investors, but to capitalize on their trust. Frost's use of these deeply personal affiliations magnifies the harm here and underscores the calculated nature of his deception.

Frost made his victims believe that he would be honest and transparent, and that he sought to make great investments with their life savings. In reality, the only thing Frost sought to make great was his own lifestyle. The damage he caused to many victims is irreparable. Impact statements submitted by victims make clear that the financial loss has been devastating. Many now suffer with financial insecurities, and many retirees have had to go back to work. Most apparent, however, is that the harm suffered extends far beyond financial loss; it is defined by physical, mental, emotional, and relational trauma. As some victims have explained[1]:

- Victim J.A.: I was scheduled to retire in March of 2026. I put my entire retirement into this and now unable to. I had to beg to keep my job.

[1] The undersigned has summarized some of the relevant portions of some of the victim impact statements received.

- Victim J.B. The depth of deception in this Ponzi crime has rocked me and my family. My mother, father, brother, 2 sisters, brother in law, and mother in law were all swindled out of monies essential to our lives by a sinister family that feigns "faith and conservative values." It turns out that "shared values" were the weapon by which we were struck down. There has been profound impact on the well being of my own family as I have had to deal with immense financial insecurity, home insecurity (as my home HELOC was a source for investment on an otherwise paid off home), anger which has spilled over to my spouse and children, seasons of depression, efforts and lessons in forgiveness - followed by more bouts of extreme anger.

  My physical health has never been worse as a direct result of this Ponzi.
- Victim J.B. First Liberty took $550,000.00 of personal investment money between January and April of 2025. This was our life savings. This financial loss is very significant for my wife and I, and affects our financial future deeply.
- Victim L.B. I worry more about every penny I spend now. I am embarrassed to even tell anyone that I fell for this scheme. It has affected every part of my life, even my faith. My blood pressure is even up now. It has also made me very distrustful of people in general. I mean when you live in the USA, you assume most people are good and ethical, not anymore.
- Victims B.B. & S.B. This crime has completely changed our trust in people. We were very proud of how we have always worked hard and

been frugal with our money. He stressed that he was a Christian, a conservative, and a good steward of people's money. Being Christians ourselves, him continuously stressing that he was a Christian, is probably the worst part of his lies. And he did this with a sincere and smiling face. For us, now when someone says they are "Christians,' it throws up a red flag.

- Victim A.C. I was introduced to Brant Frost IV by a friend. While interviewing him he assured me he had not had a bad loan, and if he did have one it would be secured by collateral and personal guarantees. I was set to retire from my job May, 2025, the same month the payments stopped. The result has been devastating. My anticipated retirement income dropped over $12,000 monthly.
- Victim L.C. My wife and I are in our 80's and concerned about our ability to make ends meet in the future. Relationally, our hearts are broken that Brant, a dear friend, would ever betray us or any of our friends for personal gain. We grieve for him, his family, and all of the victims of this puzzling felony.
- Victim L.D. I am working 7 days a week to restore the $300,000 lost that Brant IV stole. Helping [other victims] restore the $600,000 stolen as they are 89 and 80 years old.
  Brant IV often bragged "My grandchildren will be set for life."
- Victim L.N.D. The sleepless nights, stress, nausea, migraines, and random crying alone are taking a toll on my health, but the embarrassment, shame and loss of confidence can never be recovered.

My dreams of starting a business, leaving corporate America (a job that's physically harming me), and pursuing what actually matters (living a real life) have been put on hold and potentially lost forever as I physically age out of opportunities. My parents and grandma were also victims and we cannot financially pick one another up in these trying times.

- Victim D.H.H. Will need to go back to work at the age of 70.
- Victim L.H. In the first 3 or 4 months I became very depressed over the loss of our retirement funds. My husband was planning on retiring but cannot now and will have to work 3.5 more years til he is 70. He has many health problems that have been made worse by the stress of the huge loss. $600k was ALL OUR RETIREMENT (except our small 401k).
- Victim M.L. I was enticed to invest in First Liberty only well *after* it was operating as a Ponzi scheme. Nothing in the marketed "investments" hinted at the catastrophic fiscal difficulties of First Liberty so well-known to First Liberty insiders. My serial queries about the status of my investments were *always* met with solid assurances that "*Everything is good.*"
- Victim W.M.P. Plans for a retirement home are now gone and plans to pass assets down to our children and grandchildren have also been affected. The loss of this amount of money speaks for itself. I know of few people who could absorb this big a loss without it having an enormous effect financially. However, in addition to the financial impact this crime has caused, the emotional impact has also been

significant. This crime has caused me and my wife many sleepless nights, a great deal of angst, and a great deal of uncertainty. Because Frost targeted so many retirees and seniors, I believe this scheme has caused health related problems for many of the victims, including myself. Finally, there is the issue of trust. Frost targeted people of faith and conservatives and pretended to be a like-minded person. The fact that he was able to exploit our gullibility to gain our trust has had a jarring effect on how we view others.

- Victim S.R. Lost ½ of my retirement savings, approximately 20 years of savings. Retirement is no longer an option for me.
- Victim S.S. This crime was a catastrophic event for me that seriously impacted my financial security. I depended heavily on the monthly interest payment I received from First Liberty and as a result of losing that income, I had to return to work. I am 77 years old so it's been a stretch for me. The principal lost was part of my inheritance and was meant to provide support when I am no longer able to work.
- Victim C.S. I was so devastated I began to lose my mind. Ended up in Emory due to mental problems from the trauma of losing the money.

Frost's sentence should reflect the seriousness of his crime and the grave impact he has had on victims.

**B. History and Characteristics of the Defendant**

The United States recognizes certain positive aspects of Frost's background. Frost was raised in a stable environment and has a supportive family. He is married, graduated from high school, completed some college, and has

maintained steady employment throughout his adult life. Frost's history reflects someone who had every opportunity to lead a law-abiding and productive life, which he appeared to do prior to this case.

Frost portrayed himself to investors as an ethical, faith-based businessman dedicated to helping small businesses and individuals. But the callousness by which he swindled individuals out of their money tells a different story. Faced with defaults and financial shortfalls, Frost did not disclose the truth or attempt to restructure First Liberty honestly. Instead, he chose deception, concealment, and self-enrichment. He communicated directly with victims—some of whom considered him a friend—and lied to them about the viability of their investments. He also continued spending investor funds on personal luxuries: jewelry, high-end watches, rare coins, a luxury vacation rental, credit card bills, and political contributions totaling more than half a million dollars.

Frost has enjoyed advantages not available to many defendants. And his choices and actions, considered together with his personal and professional background, underscore that he was motivated only by one thing: greed.

**C. The Need for Deterrence**

The need for general deterrence in a case like this is exceptionally high, further supporting a sentence of 168 months. This sentence would serve as needed deterrence for other individuals who might consider engaging in similar large-scale financial frauds, including Ponzi-type schemes, that devastate the lives of trusting investors. Individuals who, like Frost, misuse religious and political affiliations to gain access to victims' confidence and their savings must understand that exploiting that trust carries severe consequences. A substantial

sentence ensures that those who are entrusted with others' funds will think twice before violating that trust for their own gain.

General deterrence is particularly important in fraud cases, where offenders often weigh the perceived benefits against the likelihood of detection and the severity of potential punishment. Courts in this Circuit have "expressed the view that '[g]eneral deterrence is more apt, not less apt, in white collar crime cases."' *United States v. Oudomsine*, 57 F.4th 1262, 1267 (11th Cir. 2023) (citing *United States v. Howard*, 28 F.4th 108, 209 (11th Cir. 2023)). This is because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence." *Howard*, 28 F.4th at 209 (internal quotations and citation omitted). Frost's conduct embodies this principle. Significant federal prison sentences serve as an important deterrent to help discourage other would-be fraudsters and prevent the future victimization of more innocent investors.

In sum, a sentence of 168 months would appropriately reflect the pervasiveness of Frost's Ponzi scheme, which caused over $76 million in loss to over 300 victims, and it would adequately deter other potential fraudsters. This recommendation is especially reasonable in light of that fact it would reflect a downward variance, taking into account mitigating factors, including that Frost resolved this case pre-indictment and, in doing so, allowed the United States to preserve considerable investigative and litigation resources. It also reflects aggravating factors, most notably, the seriousness of the offense and devastating harm to victims. The recommended sentence also falls well below the 20 years statutory maximum, further reinforcing its reasonableness. *See United States v.*

*Rosales-Bruno*, 789 F.3d 1249, 1257 (11th Cir. 2015). A sentence of 168 months is fair, just, and reasonable, appropriately taking into account all of the § 3553(a) factors.

For all the foregoing reasons, the United States respectfully requests that the Court sentence Frost to 168 months, to be followed by three years of supervised release, and order him to pay restitution to the victims.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/ANGELA ADAMS
*Assistant United States Attorney*
Georgia Bar No. 613114
Angela.Adams@usdoj.gov